**UNITED STATES of America, Plaintiff,**

v.

**Gregory D. HICKS and Stevens J. Shale, Defendants.**

**No. CR82–332M.**

United States District Court, W.D. Washington, at Seattle.

April 9, 1984.

Stephen J. Hyde, Aberdeen, Wash., for defendant Hicks.

T. Jeffrey Keane, Carney, Stephenson, Badley, Smith & Mueller, Seattle, Wash., for defendant Shale.

Gene S. Anderson, U.S. Atty., W.D. Wash., David V. Marshall, Asst. U.S. Atty., George D. Dysart, Sp. Asst. U.S. Atty., Seattle, Wash., F. Henry Habicht, II, Asst. Atty. Gen., James C. Kilbourne, Jean E. Williams, Land & Natural Resources Div., Dept. of Justice, Washington, D.C., for plaintiff.

### ORDER DENYING MOTION TO DISMISS AND REINSTATING THE CAUSE OF ACTION

McGOVERN, Chief Judge.

### I. INTRODUCTION

On November 24, 1982, the United States filed an information charging the Defendants Gregory D. Hicks and Stevens J. Shale with killing one cow and two bull elk within the boundaries of Olympic National Park in violation of 16 U.S.C. § 256b. The killings occurred in the lower Queets Corridor, land following the course of the Queets River from where it leaves the "core" portion of the Park to where it enters the Quinault Indian Reservation. Defendants moved to dismiss, citing Article II of the Treaty of Olympia as a complete defense to the action.

On January 12, 1984, the Court entered an order adopting the Magistrate's Report and Recommendation and dismissing the information in this cause. Subsequently, the United States sought a rehearing. The Magistrate submitted a second report and recommendation to the Court to which the Government has filed objections.

The Court has reviewed memoranda filed by the parties concerning both the first and second report and recommendation of Magistrate Weinberg. Additionally, the Court has reviewed the amicus curiae brief of Alfred J. Schweppe, the distinguished and learned Seattle lawyer. Mr. Schweppe makes a cogent argument which might very well prove valid if it were necessary to the Court's decision. Because the Court has made its decision based on statutory interpretation, it does not reach the Constitutional issue presented by Mr. Schweppe.

For the reasons stated below, on reconsideration the Court concludes as follows:

1. The Treaty of Olympia, signed long before creation of Olympic National Park, secured the "privilege of hunting" to the Quinault Indians only so long as the lands were "open and unclaimed."

2. Upon the enactment by Congress of legislation creating the Olympic National Park (16 U.S.C. §§ 251, et seq.) in 1938, if not before, the land included therein ceased to be "open and unclaimed land," thus terminating the privilege of hunting on Olympic National Park lands.

3. The 1942 legislation, 16 U.S.C. § 256b, prohibiting all hunting in the Park, terminates the Indian hunting privilege on Olympic National Park lands.

4. Termination of the Indian hunting privilege on Olympic National Park lands does not constitute abrogation.

### II. THE TREATY AND THE STATUTES

The Defendants' Motion to Dismiss is based upon Article III of the Treaty with the Qui-nai-elts (Quinault), also referred to as the Treaty of Olympia, 12 Stat. 971:

Article III. The right of taking fish at all usual and accustomed grounds and stations is secured to said Indians in common with all citizens of the Territory, and of erecting temporary houses for the

purposes of curing the same; together with the *privilege* of hunting, gathering roots and berries, and pasturing their horses on all *open and unclaimed lands.* [Emphasis added.]

*Id.* at 972.

In 1938, Congress created Olympic National Park by enactment of 16 U.S.C. §§ 251, *et seq.* The statute contemplates restricted use of the lands set aside:

§ 251. **Lands dedicated; transfer of lands included in former Mount Olympus National Monument.**

[These lands] are hereby reserved and withdrawn from settlement, occupancy, or disposal under the laws of the United States and dedicated and set apart as a public park for the benefit and enjoyment of the people and shall be known as Olympic National Park.

The effect on existing uses of the land at the time of the creation of the Park is described at 16 U.S.C. § 255:

§ 255. **Effect on existing homestead, mineral, or other entries; addition of lands**

Nothing herein contained shall affect any valid existing claim, location, or entry made under the land laws of the United States, whether for homestead, mineral, right-of-way, or any other purpose whatsoever, or shall affect the right of any such claimant, locator, or entryman to the full use and enjoyment of his land, nor the rights reserved by treaty to the Indians of any tribes.

In 1942, Congress prohibited hunting in the park by enacting 16 U.S.C. § 256b:

§ 256b. **Rules and regulations; protection of wild birds or animals, fish, timber, minerals, and natural objects; penalties for violation**

All hunting or the killing, wounding, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park [Olympic National Park], nor shall any fish be taken out of any of the waters of the park, except at such seasons and at such times and in such manner as may be directed by the Secretary of the Interior.

## III. THE "PRIVILEGE OF HUNTING" TERMINATES UPON A CHANGE IN LAND STATUS.

The Treaty preserved the Indian fishery at the "usual and accustomed" places; it focused on the Indians traditional habits as to specific places. In contrast, hunting was not preserved in relation to the Indians' customary hunting grounds. Hunting was a use to which "all open and unclaimed lands" could be put. The construction to be given the hunting provision is elucidated by considering the purposes of the Treaty of Olympia and others with similar language.

The principal purposes of the treaties are described in *United States v. Washington,* 384 F.Supp. 312, 355 (W.D. Wash.1974):

The principal purposes of the treaties were to extinguish Indian claims to the land in Washington Territory and provide for peaceful and compatible coexistence of Indians and non-Indians in the area. The United States was concerned with forestalling friction between Indians and settlers and between settlers and the government. The Indians had received constant assurances from settlers and government representatives that they would be compensated for lands which were being settled by United States' citizens. Settlers had taken up land claims under the Donation Act even though the Indian rights had not yet been extinguished by treaties as required by the act creating the Oregon Territory.... Governor Stevens and the treaty commissioners were not authorized to grant to the Indians or treat away on behalf of the United States any governmental authority of the United States.

It follows perforce that as settlement by non-Indians occurred, lands upon which the Indians could exercise their hunting privilege would diminish. The hunting privilege

is not an absolute right which when encroached is abrogated. The concept of abrogation does not apply to the Treaty hunting provision which by its terms is self-limiting. There was no representation in the Treaty that any areas would be retained as "open and unclaimed," or that any areas would be reserved from non-Indian use and occupancy. Thus, hunting may be characterized as a defeasible privilege giving way as the status of "open and unclaimed" land changes. Because the diminishment of "open and unclaimed" land was contemplated during the time the Treaty was signed, there can be no abrogation of the "privilege of hunting," although it may terminate on certain lands.

## IV. THE MEANING OF OPEN AND UNCLAIMED LANDS

In the "Report and Recommendation on Motion to Dismiss," the Magistrate quotes the Idaho Supreme Court in *State v. Arthur*, 261 P.2d 135, 141 (1953), discussing the meaning of "open and unclaimed land":

It was intended to include and embrace such lands as were not settled and occupied by the whites under possessory rights or patent or otherwise appropriated to private ownership.... *State v. Arthur, id.* at 141.

This definition is fine as far as it goes, but it is not definitive and further analysis is required. The Government recognizes that very little land would be available for treaty hunting if it were confined only to land now available ("open") for claim and settlement under the public land entry laws. Rather, the Government argues that a construction must be given that includes publicly-owned lands that are open to hunting even though they may not be "open" under the public land laws. Such is the case with national forest lands which under Ninth Circuit case law are available for treaty hunting and grazing rights. *Confederated Tribes of Umatilla Indian Res. v. Maison*, 262 F.Supp. 871, 873 (D.C.Ore.1966), *aff'd. sub nom Holcomb v. Confederated Tribes of Umatilla Indian Res.*, 382 F.2d 1013 (9th Cir.1967); *Swim v. Bergland*, 696 F.2d 712, 716–17 (9th Cir.1983).

The term "unclaimed" must have a greater meaning than that land only appropriated to private ownership. Otherwise, strict, neutral application of the term would have an alarming result. Large tracts of land taken by government entities for one or more special purposes inconsistent with hunting would necessarily be included as treaty hunting land. Federal wildlife sanctuaries, Point Defiance Park, Woodland Park, University campuses, military reservations, and other such land not in private ownership or use would be included. The Court notes that in the unpublished conclusions of law (copy attached to Government's objections filed Dec. 2, 1983) in *Confederated Tribes of Umatilla Indian Res. v. Maison*, the court contemplated that entities other than private persons could occupy land, thus removing it from the "unclaimed" status:

3. The national forest lands that are within the ceded area and other areas described in Finding 8 hereof, and all other public lands within said areas not actually occupied by private *or public* persons or corporations are "unclaimed lands" within the meeting [sic] of the Treaty of June 9, 1855 [12 Stat. 945]. At plaintiffs' request, it is not determined whether the presently established national wildlife refuges within said areas are such "unclaimed lands". [Emphasis added.]

The case dealt only with state regulation of Indian hunting on national forest lands, however, and did not define the nature of public occupation that would withdraw land from an "unclaimed" status within the treaty meaning for Indian hunting.

The construction of "open and unclaimed lands" that best accommodates Indian hunting as settlement occurs *and matures* is that "open and unclaimed lands" include public lands put to uses consistent with an Indian hunting privilege. Lands cease to be "open and unclaimed" when they are put to uses incompatible with hunting. This broad construction of "open and unclaimed lands" contemplates hunting among multiple uses with which it is com-

patible yet precludes it where it is not compatible.

The next question is whether the use for which the withdrawal of Olympic National Park lands was made is inconsistent with Indian hunting thus removing these lands from the "open and unclaimed" category.

## V. OLYMPIC NATIONAL PARK LANDS ARE NOT "OPEN AND UNCLAIMED"

As described in 16 U.S.C. § 251, *supra*, the described lands were "reserved and withdrawn from settlement, occupancy, or disposal." These lands were no longer open for private settlement. The lands are preserved as a public park for the benefit and enjoyment of the people. The House Report accompanying the Bill that created Olympic National Park states:

> The purpose of the proposed national park is to preserve for the benefit and enjoyment of the people the finest sample of primeval forest in the Pacific Northwest; *to provide suitable range and permanent protection for the herds of native Roosevelt elk and other native wildlife; . . . .*

H.R.Rep. No. 2658, 74th Cong., 2d Sess. 1 (1936) (emphasis added) (copy attached).

In a letter to the Committee on Public Lands seeking approval of the bill creating the Park, the then Secretary of the Interior, Harold L. Ickes, noted that the Park "would provide permanent protection of the last great remnant of the Roosevelt elk and sufficient winter range to maintain the species for posterity." H.R.Rep. No. 2658, at 3. Other congressional reports relating to the various bills which led to the eventual passage of the Olympic National Park Act contained similar specific recognition of the need to protect and preserve the Roosevelt elk and other wildlife. *See*, H.R. Rep. No. 1568, 75th Cong., 1st Sess. 1 (1937); H.R.Rep. No. 2247, 75th Cong., 3d Sess. 1–3 (1938); S.Rep. No. 2149, 75th Cong., 3d Sess. 2 (1938).

This Legislative history is unequivocal evidence that the Olympic National Park lands were withdrawn for a specific national use inconsistent with hunting and are no longer "open and unclaimed." In the face of population densification and urbanization, Congress recognized the value of preserving the splendor of forest tracts and their indigenous fauna for future generations.

The Olympic Peninsula in general has long been recognized as the habitat for the only native population of Roosevelt elk in the country. In 1909, President Theodore Roosevelt, in creating the Mount Olympus National Monument, the predecessor of Olympic National Park, noted that the areas within the Monument:

> embrace certain objects of unusual scientific interest, including numerous glaciers, and the region which from time immemorial has formed the summer range and breeding grounds of the Olympic elk (*cervus roosevelti*), a species peculiar to these mountains *and rapidly decreasing in numbers. . . .*

Proclamation of March 2, 1909, 35 Stat. 2247 (emphasis added) (copy attached). There is a detailed discussion of the status and distinction of the park lands and their importance to the national conservation scheme in the "Government's Memorandum in Opposition to Defendants' Memorandum on Treaty Rights," at pp. 2–6, incorporated by reference herein. (Attached for convenience.)

Because of the preservation purpose and the goal of permanently protecting the Roosevelt elk herds in creating Olympic National Park, the lands, although remaining wild and unsettled except for preexisting entries, were no longer "open and unclaimed" for hunting, within the meaning of the Treaty. The killing of a Roosevelt elk is an act inimical to its protection whether perpetrated by an Indian or a non-Indian. Hunting by any person is a use inconsistent with the purpose for which Olympic National Park was created.

■ Even if the foregoing analysis did not compel a conclusion that the Olympic National Park lands were withdrawn from the "open and unclaimed" category for In-

dian treaty hunting purposes, the enactment of 16 U.S.C. § 256b accomplished the withdrawal. Section 256b prohibits hunting and directs the Secretary of the Interior to provide such rules and regulations as necessary "for the protection of the animals and birds in the park from capture or destruction, and to prevent their being frightened or driven from the park." Section 256b unequivocally reinforces one of Olympic National Park's reasons for being that is incompatible with hunting. It is not logical to give the hunting privilege set forth in the treaty superior force in the face of the purpose for the creation of Olympic National Park when it was contemplated by the parties to the Treaty that settlement of the northwest would occur and hunting lands would diminish.

It must be noted that fishing was treated differently in the Park. The Secretary of the Interior was to "make rules and regulations governing the taking of fish from the waters in the park" during certain seasons and times. 16 U.S.C. § 256b. Thus, Indians remain free to take fish from their "usual and accustomed" places within the Park's boundaries.

It must also be noted that national forests are to be distinguished from national parks. 16 U.S.C.S. § 475 provides the "purposes for which national forests may be established and administered [:] ... to improve and protect the forest within the reservation [national forest] or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States...." In a letter to the Committee on Public Lands seeking approval of the bill creating the Park, the then Secretary of the Interior, Harold L. Ickes, explained the differences between a national forest and a national park:

> The differences between a national forest and a national park are distinct and tangible. In a national forest the timber may be sold to private companies; grazing rights may be sold to private stock owners; rivers and lakes may be dammed for private power developments; and choice scenic spots may be leased for private homes. These are only a few of the legitimate practices of forestry, in addition to which there are the hunting and trapping of the native wildlife. Such practices are all in the nature of private and individual privilege, as opposed to the general, public use. *These practices are not compatible with national parks, and that is just the crux of the difference.*

H.R.Rep. No. 2658, 74th Cong., 2d Sess. 4 (1936), (emphasis added) (copy attached).

## VI. CONCLUSION

The "privilege of hunting" set forth in the Treaty of Olympia is not an absolute right which when encroached requires specific abrogation; the concept of abrogation is inapplicable because of the Treaty's self-limiting terms. The circumstances surrounding the negotiation of the Treaty, together with the Treaty language itself describing the lands available for Indian hunting, compel a conclusion that the lands available for Indian hunting would change with the times. Homesteading as well as other kinds of settlement inimical to hunting were destined to occur and were contemplated at the time of the Treaty's negotiations. A withdrawal of lands to preserve its natural beauty and indigenous wildlife is one example of a use that is incompatible with all hunting. The explicit language contained in the legislative history to the creation of Olympic National Park supports this view. For these reasons, the Court concludes that Olympic National Park lands are not "open and unclaimed" and that the Treaty "privilege of hunting" is precluded within the Park's boundaries. Accordingly,

IT IS ORDERED ADJUDGED AND DECREED that the Court's earlier order adopting the Report and Recommendation and dismissing the information herein is vacated, Defendant's Motion to Dismiss is DENIED, and this matter shall be set for trial.

APPENDIX

## PROCLAMATIONS, 1909.

of Congress, approved June fourth, eighteen hundred and ninety-seven, entitled, "An Act Making appropriations for sundry civil expenses of the Government for the fiscal year ending June thirtieth, eighteen hundred and ninety-eight, and for other purposes," do proclaim that the Plumas National Forest is hereby enlarged and that its boundaries are as shown on the two diagrams forming a part hereof.

The withdrawal made by this proclamation shall, as to all lands which are at this date legally appropriated under the public land laws or reserved for any public purpose, be subject to, and shall not interfere with or defeat legal rights under such appropriation, nor prevent the use for such public purpose of lands so reserved, so long as such appropriation is legally maintained, or such reservation remains in force.

This proclamation shall not prevent the settlement and entry of any lands heretofore opened to settlement and entry under the Act of Congress approved June eleventh, nineteen hundred and six, entitled, "An Act to provide for the entry of Agricultural lands within forest reserves."

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the United States to be affixed.

Done at the City of Washington this second day of March, in the year of our Lord one thousand nine hundred and nine, [SEAL.] and of the Independence of the United States the one hundred and thirty-third.

THEODORE ROOSEVELT

By the President:
ROBERT BACON
*Secretary of State.*

---

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

WHEREAS, the slopes of Mount Olympus and the adjacent summits of the Olympic Mountains, in the State of Washington, within the Olympic National Forest, embrace certain objects of unusual scientific interest, including numerous glaciers, and the region which from time immemorial has formed the summer range and breeding grounds of the Olympic Elk (*Cervus roosevelti*), a species peculiar to these mountains and rapidly decreasing in numbers;

Now, therefore, I, Theodore Roosevelt, President of the United States of America, by virtue of the power in me vested by section two of the Act of Congress, approved June eighth, nineteen hundred and six, entitled, "An Act For the preservation of American antiquities," do proclaim that there are hereby reserved from all forms of appropriation under the public land laws, subject to all prior valid adverse claims, and set apart as a National Monument, all the tracts of land, in the counties of Jefferson, Clallam, Mason and Chehalis, in the State of Washington, shown as the Mount Olympus National Monument on the diagram forming a part hereof, and more particularly located and described as follows, to wit:

Beginning at the southeast corner of Section 1, Township 21 North, Range 9 West, Willamette Base and Meridian, Washington; thence northerly along the surveyed and unsurveyed range line between Ranges 8 and 9 West to the southeast corner of unsurveyed Township 26 North, Range 9 West; thence westerly between unsurveyed Townships 25 and 26 North to the southwest corner of unsurveyed Town-

ship 26 North, Range 9 West; thence northly on the unsurveyed range line between Ranges 9 and 10 West to the southwest corner of Township 29 North, Range 9 West; thence easterly on the surveyed and unsurveyed township line between Townships 28 and 29 North to the northeast corner of unsurveyed Township 28 North Range 6 West; thence southerly along the unsurveyed range line between Ranges 5 and 6 West to southeast corner of Township 28 North, Range 6 West; thence easterly along the unsurveyed township line between unsurveyed Townships 27 and 28 North, to the northeast corner of Township 27 North, Range 5 West; thence southerly along the unsurveyed range line between Ranges 4 and 5 West to the southeast corner of unsurveyed Township 25 North, Range 5 West; thence westerly along unsurveyed township line between townships 24 and 25 North to the Northeast corner of Township 24 North, Range 6 West; thence southerly along the unsurveyed range line between Ranges 5 and 6 West to the southeast corner of Township 23 North, Range 6 West; thence westerly along the unsurveyed township line between Townships 22 and 23 North to the northeast corner of Township 22 North, Range 7 West; thence southerly along the surveyed and unsurveyed range line between Ranges 6 and 7 West to the northeast corner of Section 12, Township 21 North, Range 7 West; thence westerly along section line to the southwest corner of Section 6 of said Township; thence northerly along the range line to the northwest corner of said Section, said Township; thence westerly along the township line between Townships 21 and 22 North to the northwest corner of Section 4, T. 21 North, Range 8 West; thence southerly along the section line to the southeast corner of Section 16, said Township; thence westerly along the section line to the southwest corner of Section 18, said Township; thence northerly to the southeast corner of Section 1, Township 21 North, Range 9 West, the place of beginning.

The reservation made by this proclamation is not intended to prevent the use of the lands for forest purposes under the proclamations establishing the Olympic National Forest, but the two reservations shall both be effective on the land withdrawn, but the National Monument hereby established shall be the dominant reservation and any use of the land which interferes with its preservation or protection as a National Monument is hereby forbidden.

Warning is hereby given to all unauthorized persons not to appropriate, injure, remove, or destroy any feature of this National Monument, or to locate or settle upon any of the lands reserved by this proclamation.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the United States to be affixed.

Done at the City of Washington this second day of March, in the year of our Lord one thousand nine hundred and nine, and [SEAL.] of the Independence of the United States the one hundred and thirty-third.

THEODORE ROOSEVELT

By the President:
ROBERT BACON
*Secretary of State.*

**1170**

FOREST SERVICE U S. DEPT OF AGRICULTURE
1909
MT. OLYMPUS NATIONAL MONUMENT
WITHIN OLYMPIC NATIONAL FOREST
WASHINGTON
WILLAMETTE MERIDIAN AND BASE
NATIONAL MONUMENT BOUNDARY
(DIAGRAM FORMING A PART OF PROCLAMATION
DATED MARCH 2, 1909)

| 75TH CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPORT<br>No. 1568 |
| --- | --- | --- |

# ESTABLISHING THE MOUNT OLYMPUS NATIONAL PARK

AUGUST 16, 1937.—Committed to the Committee of the Whole House on the state of the Union and ordered to be printed

Mr. HILL of Washington, from the Committee on the Public Lands, submitted the following

# REPORT

[To accompany H. R. 4724]

The Committee on the Public Lands, to whom was referred the bill (H. R. 4274) to establish the Mount Olympus National Park, in the State of Washington, and for other purposes, after careful consideration of same, report favorably thereon with the recommendation that the bill do pass the House without amendment.

## STATEMENT OF FACTS

H. R. 4724 is a similar bill to H. R. 7086, Seventy-fourth Congress, second session, save and except that this bill contains a drastic modification in boundary, which modification was accepted to alleviate objections made to the prior legislation on this subject.

The purpose of the proposed national park is to preserve for the benefit and enjoyment of the people parts of the finest sample of primeval forest in the Pacific Northwest; to provide suitable range and permanent protection for the herds of native Roosevelt elk and the other native wildlife; to conserve and render available to the people, for recreational use, these outstanding expressions of nature in addition to the magnificient mountain scenery and numerous glaciers of the Olympic Range.

The purpose of the bill, H. R. 4724, is to abolish the existing Mount Olympus National Monument, a mountainous area of 298,730 acres which does not contain the finest example of the northwest forest or winter range for the elk, and to establish a national park to be known as the Mount Olympus National Park, with an area of 642,360 acres including the present monument area and a suitable sample of the adjacent primeval forest and game range.

The lands outside of the present monument, which it is proposed to include within the national park, are at present within the Olympic National Forest and are administered by the Department of Agriculture, subject to the logging practices of the United States Forest Service. Many of the trees within the proposed Park area are centuries old and can never be replaced once they are cut down. By giving this area national-park status, these trees will be saved from logging and will be made available for the inspiration of the people.

The effect of the bill will be to determine the appropriate use and the proper administrative responsibility for an area of national-park quality.

This bill does not entail an appropriation for the purchase of additional lands, but merely an exchange between the Department of Agriculture and the Interior Department.

1172

# MOUNT OLYMPUS NATIONAL PARK

MAY 14, 1936.—Committed to the Committee of the Whole House on the state of the Union and ordered to be printed

Mr. ROBINSON of Utah, from the Committee on the Public Lands, submitted the following

# REPORT

[To accompany H. R. 7086]

The Committee on the Public Lands, to whom was referred the bill (H. R. 7086) to establish the Mount Olympus National Park in the State of Washington, and for other purposes, having considered the same, hereby report the bill without amendment with the recommendation that the bill be passed.

The purpose of the proposed national park is to preserve for the benefit and enjoyment of the people the finest sample of primeval forest in the Pacific Northwest; to provide suitable range and permanent protection for the herds of native Roosevelt elk and the other native wildlife; to conserve and render available to the people, for recreational use, these outstanding expressions of nature in addition to the magnificent mountain scenery and numerous glaciers of the Olympic Range.

The purpose of the bill (H. R. 7086) is to abolish the existing Mount Olympus National Monument, a mountainous area of 298,730 acres which does not contain the finest example of the northwest forest or winter range for the elk, and to establish a national park to be known as the Mount Olympus National Park, with an area of 728,360 acres including the present monument area and a suitable sample of the adjacent primeval forest and game range.

The lands outside of the present monument, which it is proposed to include within the national park, are at present within the Olympic National Forest and are administered by the Department of Agriculture, subject to the logging practices of the United States Forest Service. Many of the trees within the proposed park area are centuries old and can never be replaced, once they are cut down. By giving the area national park status, these trees will be saved from logging and will be made available for the inspiration of the people.

The effect of the bill will be to determine the appropriate use and the proper administrative responsibility for an area of national park quality.

Extensive hearings were held on this bill, and it was reported out without amendment, with a recommendation that the bill do pass.

Further facts concerning the proposed legislation are set forth in the reports of the Department of Agriculture and the Department of the Interior, which reports are hereinbelow set out in full and made a part of this report as follows:

DEPARTMENT OF AGRICULTURE,
*Washington, May 22, 1935.*

Hon. RENÉ L. DEROUEN,
*Chairman, Committee on the Public Lands,*
*House of Representatives.*

DEAR MR. DEROUEN: Further reference is made to your letter of April 3 requesting the views of this Department on the bill H. R. 7086, "To establish the Mount Olympus National Park in the State of Washington, and for other purposes."

Of the area described in the bill, 298,730 acres are now in the Mount Olympus National Monument; of the balance, which is in the Olympic National Forest, 279,595 acres support a stand of merchantable timber estimated at 13,624,431,000 board feet.

In addition to timber values, the area which now has national forest status (but of which it is proposed to make a national park) possesses possibilities for extensive hydroelectric power development (part of which is already covered by an approved power permit), with values amounting to a regulated flow potential of 17,500 horsepower with an estimated natural flow potential of 57,250 horsepower for 90 percent of the time. And with large bodies of manganese ore known to exist, and two mines which have been developed, it is believed that this area also contains worth while mineral values.

Thus the enactment of H. R. 7086 would withdraw from utilization minerals, potential power, and some 13,500,000,000 board feet of merchantable timber in a locality where approximately 70 percent of some 63,000 people are, and apparently always will be, dependent upon forest-products industries for a livelihood. For industrial utilization of natural resources has always been held wholly incompatible with National Park administration.

Such utilization is, however, permitted and encouraged—under safeguards which assure perpetuation—in the National Forests. So that if this timber remains, as it now is, in the Olympic National Forest, it will not be withdrawn from channels of commerce and will, therefore, offer an excellent opportunity for the establishment of sustained cutting units which will add materially to the stability and permanence of industry and commerce in dependent communities such as Aberdeen, Hoquiam, Port Angeles, Shelton, and Port Townsend.

The outstanding "park" features of which it is proposed to protect and develop by this bill are the glaciers, alpine topography, and the Roosevelt elk. Enforcement of the game laws by State authorities and this Department's Forest Service has been so effective that hunting is no longer a real menace to the elk herds. Controlled hunting is, in fact, agreed upon as a necessity, for there is a real problem in providing winter range for the Roosevelt elk, although passage of H. R. 7086 would in no way aid in solving this problem. And glaciers and alpine topography are not ordinarily classed as destructible resources.

No irreconcilable conflict need exist between the preservation of inspirational and educational values of national significance and the preservation of the prevailing and planned local economy. Both classes of values adequately can be safeguarded and conserved under the principles of management applied by this Department. The need for a balancing of values and uses seems evident. Subject as it is to heavy fogs and excessive precipitation, the territory involved has a normal recreational season of only 2 or 3 months, and a local economy based largely upon a tourist business covering so small a part of the year and subject to the fluctuations of public interest and patronage which inevitably occur, would be far less secure than an economy based on a balanced program of both recreational uses and industrial uses.

It is the understanding of this Department that, after active discussion for a year or more, by Olympic Peninsular agencies generally, the proposal embodied in H. R. 7086 is now disapproved and opposed by the majority of representative local agencies. It seems that on April 6 of this year the Olympic Development League, an organization of the various chambers of commerce of the Olympic Peninsula, voted unanimously against the elimination of any lands from the Olympic National Forest for the creation of a National Park and, going further, voted to request the return of the Mount Olympus Monument to a national-forest status. Similar action has, we are informed, been recommended by the special committee of the Washington State Planning Council which was appointed to study this matter.

All factors considered, no reasons occur to this Department for the approval of a measure which, unnecessary to preserve values of national significance, would so markedly upset the prevailing economy of the Olympic Peninsula and which is opposed by so representative a part of the local interests involved.

Sincerely,

H. A. WALLACE, *Secretary.*

DEPARTMENT OF THE INTERIOR,
*Washington, March 16, 1936.*

Hon. RENÉ L. DEROUEN,
*Chairman, Committee on the Public Lands,*
*House of Representatives.*

MY DEAR MR. CHAIRMAN: Further reference is made to your letter of April 3, 1935, requesting a report upon H. R. 7086, entitled "A bill to establish the Mount Olympus National Park, in the State of Washington, and for other purposes."

The bill has the earnest support of conservation organizations throughout the country. The purpose of this bill is to establish a national park which will include the present Mount Olympus National Monument, additional area of high scenic value, and a sufficient section of the adjacent primeval forest to insure its perma-

nent protection. The proposed park would save from logging the finest representation of the remaining Northwest forests. It would provide permanent protection of the last great remnant of the Roosevelt elk and sufficient winter range to maintain the species for posterity. It would preserve one of the most scenic, unspoiled areas within our country, measuring up in every respect to the high standards set for national parks and monuments. (See exhibit A.)

The monument was established on March 2, 1909, by Presidential proclamation and placed under jurisdiction of the United States Forest Service, which administered it until 1933. During that time, the monument was reduced to about one-half of its original acreage (see exhibit B) by three successive Presidential proclamations, April 17, 1912, May 11, 1915, and January 7, 1929. Timber was cut in the lopped-off portions, which were returned to the Olympic National Forest. On June 10, 1933, jurisdiction of the monument was transferred by Executive Order No. 6166 to the National Park Service.

The Department of Agriculture in its adverse report upon the bill, May 22, 1935, stated:

"Of the area, described in the bill, 298,730 acres are now in the Mount Olympus National Monument; of the balance, which is in the Olympic National Forest, 279,595 acres support a stand of merchantable timber estimated at 13,624,431,000 board feet."

These figures are imposing but they need careful examination. Many loggers are doubtful that they will ever be able to log with a profit on a large portion of the Olympic National Forest. The estimators of the Forest Resource Survey, under supervision of the Pacific Northwest Forest Experiment Station, estimated that under economic conditions such as prevailed between 1925–29, only about 55 percent of the National Forest timber could be logged at a profit; 30 percent could only be logged at a loss not exceeding $5 per thousand board feet; and 15 percent could be logged only at a loss exceeding $5 per thousand board feet. The economically available timber within the proposed park is undoubtedly much lower than 55 percent of the total supply because it includes a very large share of the high country timber which is nonexploitable, either because of inferior species, inferior quality, or difficult topography.

The Grays Harbor communities are considered the center of the timber industry on the Olympic Peninsula. Timber estimates indicate that about 9,000,000,000 board feet of timber, considered tributary to Grays Harbor mills, would be included within the proposed park. It is also estimated by competent foresters that about 5,000,000,000 board feet of this would never be commercially available. That means that the proposed park would eliminate about 4,000,000,-000 board feet of commercially available timber from the Grays Harbor mills or enought to run the mills about 4 years if they were dependent entirely upon this supply.

But, the estimates of the Forest Resource Survey show that there are over 79,000,000,000 board feet of timber on the Olympic Peninsula. In addition to this, it is observed that saw logs in the Pacific Northwest flow from market to market almost as freely as do commodities such as wheat or cotton in other regions. Particularly where water transportaton is readily available timber acts as a fluid commodity. Saw logs are at times even known to flow away from Grays Harbor to other markets.

From these considerations it becomes improbable that more than half of the 13 billion board feet of timber included within the proposed park would ever be logged, even if left outside of the park. It is evident that this 6½ billion feet of commercial timber is not withdrawn from the local supply alone, but, because of the fluidity of timber as a commodity, it is withdrawn from the much greater timber resources of the Northwest as a whole. The conclusion seems evident that establishment of the Mount Olympus National Park would not necessarily, or even probably, affect the timber industries of the Olympic Peninsula adversely. Moreover, the forest would not be withdrawn from use but would merely be given a different, less destructive kind of use.

The Chief Forester states in a letter, which was read before the national park subcommittee of the State planning committee, that the proposed park would not have "any effect other than the establishment of two types of Federal reservation of practically similar character, subject to the same principles of use and differing only in the agency of administration." This statement is fundamental to the whole question and needs careful examination.

The differences between a national forest and a national park are distinct and tangible. In a national forest the timber may be sold to private companies; grazing rights may be sold to private stock owners; rivers and lakes may be dammed for private power developments; and choice scenic spots may be leased for private homes. These are only a few of the legitimate practices of forestry, in addition to which there are the hunting and trapping of the native wildlife. Such practices are all in the nature of private and individual privilege, as opposed to the general, public use. These practices are not compatible with national parks, and that is just the crux of the difference. What is meant by adequate protection of scenic resources in national forests is not the same as that provided in national parks. In the case of Mount Olympus, the very trees which it is

desired to save, because they could not be reproduced short of several hundred years, are the trees which would be chopped down. A primeval forest such as this is not a replaceable resource. Therefore, the cropping technic of forestry are not applicable to it. And if they are not applicable to it, then there is no reason why it should not be a national park.

It is stated by the Department of Agriculture:

·"No irreconcilable conflict need exist between the preservation of inspirational and educational values of national significance, and the preservation of the prevailing and planned local economy. Both classes of values adequately can be safeguarded and conserved under the principles of management applied by this Department."

The principles of management referred to are the well-known "selective logging", "sustained yield", and "multiple use" principles applied to national forests. Selective logging is usually thought of as the careful selection of individual, mature trees or groups of mature trees throughout the forest. A sustained yield means that the trees cut each year shall equal the amount of the annual growth. These are excellent principles of forestry. But in the dense forests of the Olympic Peninsula, with rough topography, selective logging of the above-described type is not yet practical. Topography, forest stand, and economic conditions have forced a selective logging on the area basis or economic basis. Whole strips or tracts of timber are clear cut. Or, the tracts which are most economically removed are selected first. On a forest of 100,000 acres, for example, cut under a 100-year rotation plan, 1,000 acres may be clear cut each year. This is still selective logging under a sustained-yield plan of management. It may be good forestry, but it is totally destructive of the inspirational and recreational values of the forest. Such procedure is fully described and approved in the Handbook of Forest Practice, for the West Coast Logging and Lumber Division, covering the rules of forest practice for the Douglas-fir region under article X of the Lumber Code. Photostatic copies of the diagrams are given in exhibit C. It is perfectly obvious that an irreconcilable conflict does exist between the preservation of outstanding recreational values, and the accepted practices of forestry within the proposed park area. It is also obvious that such management is not a multiple use at all, but is a very single form of land use.

The scenic, recreational, and scientific values of the proposed Mount Olympus National Park are of such superlative quality that they should be conserved unimpaired for human use. A national park is the only known economic form of land use which will, at the same time, conserve the area. Forestry must feed upon the area. The tourist business produces a more "sustained yield" than could ever be attained by the chopping of these trees. It is more truly a "multiple use" of the resource than logging would be, for it contributes to a great variety of industries and human needs. A national park comes far nearer to the forestry aim, "the greatest good to the greatest number", than could ever be achieved by selling these trees to private logging companies.

Over and above these considerations, we should establish this park for the good of our country.

It is urgently recommended that H. R. 7086 be approved, with the following amendments:

Beginning on page 1, strike out line 8 and the lines intervening up to and including the word "meridian" on page 4, line 4, and insert the following:

"Township 26 north, range 4 west, sections 1 to 12, 17 to 20, and 29 to 32, inclusive; township 27 north, range 4 west, sections 5 to 8, 17 to 20, and 29 to 36, inclusive; township 28 north, range 4 west, sections 19 to 23, inclusive, north half section 26, north half and southwest quarter section 27, sections 28 to 32, inclusive, and north half section 33; townships 25, 26, and 27 north, range 5 west; township 28 north, range 5 west, sections 7 to 36, inclusive; township 24 north, range 6 west, sections 3 to 10, and 15 to 18, inclusive; those parts of sections 19, 20, 21, 22, and 30 northwest of the divide between the Quinault and Skokomish Rivers; townships 25, 26, and 27 north, range 6 west; township 28 north, range 6 west, sections 7 to 36, inclusive; township 23 north, range 7 west, that part north of the divide between the Quinault and Wynoochee Rivers; township 24 north, range 7 west, that part north of the divide between the Quinault River on the north and the Skokomish and Wynoochee Rivers on the south; townships 25, 26, and 27 north, range 7 west; township 28 north, range 7 west, sections 4 to 36, inclusive; township 23 north, range 8 west, that part north of the divide between the Quinault and Humptulips Rivers; township 24 north, range 8 west, (partly surveyed); townships 25 to 28 north, range 8 west; township 29 north, range 8 west, sections 19 to 21 and sections 28 to 33, inclusive; township 30 north, range 8 west, sections 18, 19, and 30 (partly surveyed); township 23 north, range 9 west, that part northwest of the divide between Humptulips River and the streams flowing into Quinault Lake and outside of the Quinault Indian Reservation (partly surveyed); townships 24 and 25 north, range 9 west, (partly surveyed); township 26 north, range 9 west, sections 1 to 18, inclusive; east half section 19, sections 20 to 29 and sections 32 to 36, inclusive (surveyed); township 27 north, range 9 west, (surveyed); township 28 north, range 9 west; township 29 north, range 9 west, sections 3 to 10 and sections 13 to 36, inclusive (partly

surveyed); township 30 north, range 9 west, sections 13 and 14, and sections 23 to 35, inclusive (partly surveyed); township 23 north, range 10 west, sections 1 to 5 and sections 8 to 17, inclusive; and sections 22. 23 and 36 outside of the Quinault Indian Reservation (surveyed); township 24 north, range 10 west, sections 1 to 5, 8 to 17, 20 to 29 and 32 to 36, inclusive; township 25 north, range 10 west, sections 12 and 13, east half and southwest quarter section 14, south half section 15, sections 22 to 27 and sections 34 to 36, inclusive (surveyed); township 26 north, range 10 west, sections 1, 12 and 13 (surveyed); township 27 north, range 10 west, sections 1 to 18 and sections 20 to 26, inclusive; north half section 27, north half section 28, north half section 29, and section 36 (surveyed); township 28 north, range 10 west, south half section 7, south half section 8, south half section 9, south half section 10, south half section 11, south half section 12, sections 13 to 36, inclusive, Willamette meridian."

On page 5, line 1, add the words "as amended" and a comma before "known".

The boundary herein recommended embodies two modifications of the boundary proposed in the bill (H. R. 7086). On the west side of the proposed park a segment of the Bogachiel River drainage has been excluded because it contains a large block of valuable, privately owned timber. On the east side of the proposed park an addition has been recommended to include an area of outstanding scenic value. A map of the proposed park, with these suggested boundary changes, is attached as exhibit D.

The area herein recommended for national-park status contains approximately 728,360 acres of which 10,660.10 acres are privately owned, 55.41 acres in unperfected entries, and 64.52 acres State school land which would be a basis for indemnity selection outside the area by the State of Washington. Certain of the lands involved have been reserved under section 24 of the Federal Water Act of June 10, 1920, as Federal power projects upon application therefor to the Federal Power Commission, and there are also seven power-site classifications which have been made, based upon recommendations by the Geological Survey that the lands have power-site value in connection with future water-power development. Parts of township 23 north, ranges 8 and 9 are within the limits of a grant to the Northern Pacific Railway Co. Section 2 of the bill provides that nothing contained therein shall affect any valid existing claims made on the land.

This Department has been advised by the Bureau of the Budget that there would be no objection to the submission of this report to the Congress.

Sincerely yours,

HAROLD L. ICKES,
*Secretary of the Interior.*

| 75TH CONGRESS | HOUSE OF REPRESENTATIVES | REPORT |
| 3d Session | | No. 2247 |

# ESTABLISHING THE OLYMPIC NATIONAL PARK, IN THE STATE OF WASHINGTON

APRIL 28, 1938.—Committed to the Committee of the Whole House on the state of the Union and ordered to be printed

Mr. DeRouen, from the Committee on the Public Lands, submitted the following

# REPORT

[To accompany H. R. 10024]

The Committee on the Public Lands, to whom was referred the bill (H. R. 10024) to establish the Olympic National Park, in the State of Washington, and for other purposes, after holding extended hearings and careful consideration report favorably thereon with the recommendation that the bill be enacted into law with the following amendments:

Page 6, line 2, after the word *"Provided"* strike out all remaining language of section 1 and insert in lieu thereof the following:

That the portion of the Olympic National Forest lying west of the line separating ranges 10 west and 11 west, measured from the Willamette meridian, shall not be included as a part of the area to be known as the Olympic National Park.

Page 8, line 4, strike out the colon after the word "Interior" and insert in lieu thereof a period.

Page 8, line 4, beginning with the word *"Provided"* strike out all remaining language of section 2.

### STATEMENT OF FACTS

The purpose of the proposed national park is to preserve for the benefit, use and enjoyment of the people, the finest sample of primeval forests of Sitka spruce, western hemlock, Douglas fir, and western red cedar in the entire United States; to provide suitable winter range and permanent protection for the herds of native Roosevelt elk and other wildlife indigenous to the area; to conserve and render available to the people, for recreational use, this outstanding mountainous country, containing numerous glaciers and perpetual snow fields, and a portion of the surrounding verdant forests together with a narrow strip along the beautiful Washington coast.

The purpose of the bill H. R. 10024, as amended, is to abolish the existing Mount Olympus National Monument, a mountainous area of 322,000 acres, which does not contain adequate samples of the magnificent forests, does not include all the desirable mountainous country, or sufficient winter range for the elk and other wildlife, and to establish the Olympic National Park with an area of 898,292 acres including the present monument area and the strip along the Pacific Ocean, which area does contain excellent examples of the northwest forests and a suitable amount of winter range for the herds of native Roosevelt elk and other wildlife.

Except for 37,597 acres of land in the strip along the ocean, the lands outside the present monument are now within the Olympic National Forest, subject to the logging practices of the United States Forest Service. Many of the trees within the proposed park are of great size, centuries old, and can never be replaced once they are cut down. By giving the area national-park status these forests will be saved from logging and will be preserved for the recreation and inspiration of the people.

Extensive hearings were held on H. R. 7086 (74th Cong.) and short hearings were afforded special representatives of the State of Washington in 1937 on H. R. 4724 and in 1938 on this bill H. R. 10024. The committee has heard a very great deal of testimony on this proposal, both for and against it, but it is noteworthy that, although there was a difference of opinion on the area to be included, no witnesses from the State of Washington appeared before the committee who did not approve of the creation of a national park in this region.

In arriving at the determination of the area to be recommended for park status, the committee carefully considered the desires of many conservation organizations and numerous individuals who wanted as large an area in the park as possible, and also considered the needs of the local communities dependent upon the harvesting and manufacturing of forest products. Expert testimony on the needs of timber utilization was head and it is the thought of the committee that the establishment of the park will not have an adverse effect upon local wood-using industries. The enactment of the bill will fulfill a definite need for the conservation of natural resources.

The amendments to the bill exclude from the proposed park 32,960 acres of land in the Olympic National Forest of which 6,151 acres is privately owned. The provision has been eliminated which would empower the President to add to the park by proclamation about 61,629 acres of private- and State-owned land connecting the main body of the park with the coastal strip which, it was thought, might have an unfavorable effect upon the management and operation of the State-owned sustained-yield forest adjacent thereto.

The present bill, H. R. 10024, also excludes about 2 billion feet of the more accessible timber tributary to Grays Harbor which was included in the original bill, H. R. 7086. This should adequately satisfy the need for timber in this region.

The bill has also been amended to allow prospecting under the mining laws of the United States, in certain portions of the park, for a period of 5 years.

Originally the bill H. R. 10024 called for the establishment of a park containing 927,000 acres supporting a stand of timber estimated at 19.3 billion board feet, and would allow the President to add to the park 61,597 acres of private and State land supporting a stand of timber estimated at 1.5 billion board feet. As amended the bill would establish a park of 898,292 acres containing 17.4 billion board feet of timber, which eliminates 3.4 billion board feet of timber from H. R. 10024 as introduced. The committee is advised that only about 30 percent of this timber could now be considered economically available.

The effect of the bill will be to establish the appropriate use and proper administration of an area definitely of national park quality.

The Bureau of the Budget and the Department of Agriculture have not reported on H. R. 10024 but did report on H. R. 4724 and the amendments thereto submitted by the Secretary of the Interior, which, as amended, was substantially the same as H. R. 10024.

The Committee is advised that this legislation is in accord with the program of the President and that the Department of Agriculture is in agreement with the Department of the Interior on the area proposed for park status.

The reports of the Department of the Interior on H. R. 4724 and H. R. 10024 are herein set forth in full and made a part of this report as follows:

DEPARTMENT OF THE INTERIOR,
*Washington, D. C.*

Hon. RENÉ L. DEROUEN,
*Chairman, Committee on the Public Lands,*
*House of Representatives.*

MY DEAR MR. CHAIRMAN: This is with further reference to your letter of March 11, 1937, enclosing a copy of H. R. 4724, entitled "A bill to establish the Mount Olympus National Park, in the State of Washington, and for other purposes"; and requesting a report thereon.

A final report on this bill, which was reported out by your committee on August 16, 1937, has not been made by this Department previously, due to the many conflicting factors involved in the proposal. Therefore, subsequent to the introduction of H. R. 4724, this Department has been engaged in efforts to secure adjustments of the various conflicting factors, and it is believed these matters are now settled to the satisfaction of all concerned.

There is enclosed a map showing, by the black line, the boundary recommended for the park, which will necessitate amending H. R. 4724 as indicated hereinafter. In addition, it is recommended that the President be authorized to add to the park any lands which may in the future be acquired by the United States by donation or otherwise within the area outlined by the dotted line on the attached map.

I believe your committee is in full agreement with the purposes of this proposed legislation, as evidenced by the committee action in reporting out favorably the present bill as well as a similar bill, H. R. 7086, of the last Congress. If enacted, this proposed legislation would preserve forever this great wilderness from misuse and would render it available for the inspiration, education, and recreation of

the people as a national park. The park, if established as herein recommended, would include the finest virgin forest on the Olympic Peninsula. The boundaries as herein recommended include primitive areas, now included within the Olympic National Forest, but for which no permanent protection is assured at present. The park would include the present Mount Olympus National Monument and a splendid area, shown on the enclosed map, along the coast. The park would also provide permanent protection of the Roosevelt elk, and sufficient winter range to preserve the species for posterity. It would conserve one of the most scenic, unspoiled areas within our country, measuring up in every respect to the high standards set for national parks.

In view of the necessary adjustments as indicated above, it is recommended that the following amendments to H. R. 4724 be made:

In the title of the bill, strike out the words "Mount Olympus" and insert in lieu thereof the word "Olympic".

After the word "abolished", in line 5, page 1, strike out the remainder of section 1 and insert in lieu thereof the following:

"and the tracts of land in the State of Washington particularly described as follows, to wit: Township 26 north, range 3 west, sections 6 and 7 (unsurveyed); township 27 north, range 3 west, sections 6, 7, 18, 19, 30, and 31 (unsurveyed); township 23 north, range 4 west, north half section 6 (unsurveyed); township 24 north, range 4 west, sections 19, 20, and 31 (unsurveyed); township 25 north, range 4 west, sections 4 to 9, 16 to 21, and 28 to 33, inclusive (unsurveyed); township 26 north, range 4 west, sections 1 to 12, 16 to 21, and 28 to 33, inclusive (unsurveyed); township 27 north, range 4 west, all (unsurveyed); township 28 north, range 4 west, sections 17 to 22, and 27 to 34, inclusive (unsurveyed); township 23 north, range 5 west, north half section 1, northeast quarter section 2, and sections 18 and 19 (partly surveyed); township 24 north, range 5 west, sections 1 to 18, 20 to 27, inclusive, north half section 28, east half section 34, and sections 35 and 36 (unsurveyed); townships 25 north to 28 north, range 5 west, all (unsurveyed); township 29 north, range 5 west, sections 7 and 17 to 36, inclusive (partly surveyed); township 23 north, range 6 west, sections 2 to 6, 10 to 15, inclusive, and 23 and 24 (unsurveyed); township 24 north, range 6 west, sections 1 to 24, 26 to 35, inclusive (unsurveyed); townships 25 north to 29 north, range 6 west, all (partly surveyed); township 23 north, range 7 west, sections 1 to 12, inclusive (unsurveyed); townships 24 north to 29 north, range 7 west; all (unsurveyed); township 30 north, range 7 west, sections 26 to 36, inclusive (partly surveyed); township 23 north, range 8 west, that part north of the divide between the Quinault and Humptulips Rivers (unsurveyed); townships 24 north to 29 north, range 8 west, all (unsurveyed); township 30 north, range 8 west, sections 18, 19, and 25 to 36, inclusive (partly surveyed); township 22 north, range 9 west, northwest quarter section 5, north half section 6 (surveyed); township 23 north, range 9 west, that part northwest of the divide between Humptulips River and the streams flowing into Quinault Lake and outside the Quinault Indian Reservation except northwest quarter section 6 (partly surveyed); township 24 north, range 9 west, sections 1, 2, 11 to 14, 22 to 27, and 34 to 36, inclusive (partly surveyed); township 25 north, range 9 west, all (unsurveyed); township 26 north, range 9 west, sections 1 to 18, east half section 19, sections 20 to 29, and 32 to 36, inclusive (surveyed); townships 27 and 28 north, range 9 west, all (partly surveyed); township 29 north, range 9 west, all except those parts of sections 7, 18, 19, and 30 lying west of Soleduck River and Alckee Creek (partly surveyed); township 30 north, range 9 west, sections 13 and 14, and 19 to 36, inclusive (surveyed); township 23 north, range 10 west, southeast quarter section 1, east half section 11, and sections 12 to 14, inclusive, those parts of sections 23 and 36 outside of Quinault Indian Reservation (surveyed); township 26 north, range 10 west, sections 1, 12, and 13 (surveyed); township 27 north, range 10 west, sections 1 to 18, 20 to 26, inclusive, north half section 27, north half section 28, north half section 29, section 36 (surveyed); township 28 north, range 10 west, all that part south of the divide between Bogachiel and Soleduck Rivers and east of Alckee Creek (unsurveyed); township 29 north, range 10 west, all that part south of the divide between Bogachiel and Soleduck Rivers and east of Alckee Creek (unsurveyed); township 27 north, range 11 west, sections 1 to 13, inclusive, north half section 14, north half section 15, section 16, north half section 17 (surveyed); township 28 north, range 11 west, all south of divide between Sitkum and Calawah Rivers (unsurveyed); township 27 north, range 12 west, sections 1 to 3, north half section 10, north half and southeast quarter section 11, and section 12 (surveyed); township 28 north, range 12 west, those parts of sections 25 and 26 south of the divide between Calawah and Bogachiel Rivers, sections 27 and 31 to 36, inclusive (surveyed); township 24 north, range 13 west, sections 3, 4, 9, 10, 15, 16, 22, and lots 1 and 2 section 27 (surveyed); township 25 north, range 13 west, west half section 4, sections 5, 8, west half section 9, sections 16, 17, 21, 28, 33, west half section 34 (surveyed); township 26 north, range 13 west, sections 17, 18, those parts sections 19, 20, 29, and 30 outside Hoh Indian Reservation, west half section

28, section 32, west half section 33 (surveyed); township 26 north, range 14 west, all (surveyed); township 27 north, range 14 west, sections 6, 7, west half section 8, sections 16, 17, 18, 20, 21, 22, south half section 23, sections 26, 27, 28, 34, and 35 (surveyed); township 28 north, range 14 west, section 31 (surveyed); township 27 north, range 15 west, all (surveyed); township 28 north, range 15 west, west half section 4, sections 5, 6, 8, 9, west half section 15, sections 16, 23, 26, and all sections 21, 22, and 27 outside Quileute Indian Reservation, and sections 34, 35, and 36 (surveyed); township 29 north, range 15 west, all of Ozette Lake in sections 3, 4, and 10, west half section 5, sections 6 and 7, west half section 8, west half section 17, sections 18 and 19, west half section 20, sections 29, 30, and 32 (surveyed); township 30 north, range 15 west, all west of eastern shore line of Ozette Lake (surveyed); township 31 north, range 15 west, sections 30 and 31, and those parts of sections 32 and 33 southwest of the northeast shore of Ozette Lake (surveyed); township 30 north, range 16 west, all (surveyed); township 31 north, range 16 west, those parts of sections 25 and 26 south of Ozette Indian Reservation, and sections 35 and 36 (surveyed); all west of the Willamette meridian, in Washington, are hereby reserved and withdrawn from settlement, occupancy, or disposal under the laws of the United States and dedicated and set apart as a public park for the benefit and enjoyment of the people and shall be known as the Olympic National Park, and all lands formerly included in the Mount Olympus National Monument and not included in the above description are hereby transferred to and made a part of the Olympic National Forest: *Provided,* That the President may, by proclamation, add to said park, any lands within the following described area, to wit: Township 27 north, range 10 west, section 19, south half section 29, section 30 and north half section 31 (surveyed); township 27 north, range 11 west, south half section 14, south half section 15, south half section 17, sections 18 to 33, inclusive, north half and southeast quarter and north half southwest quarter and southwest quarter southwest quarter section 34, north half and southwest quarter section 35, and section 36 (surveyed); township 26 north, range 12 west, sections 4 and 5, east half and southwest quarter section 6, sections 7 and 8, north half section 9, and section 18 (surveyed); township 27 north, range 12 west, sections 4 to 9, inclusive, south half section 10, southwest quarter section 11, sections 13 to 18, inclusive, sections 20 to 29, inclusive, sections 32 and 33, north half section 34, northwest quarter section 35 (surveyed); township 26 north, range 13 west, southeast quarter section 1, south half section 11, sections 12, 13, and 14, south half section 15, south half section 16, sections 21 to 24, inclusive, sections 26 and 27, east half section 28 (surveyed); township 27 north, range 13 west, sections 1 and 2, east half section 11, sections 12 and 13 (surveyed); township 28 north, range 13 west, sections 17 to 21, inclusive, sections 26 to 29, inclusive, north half section 32, sections 33 to 36, inclusive (surveyed); township 28 north, range 14 west, section 13, east half and southwest quarter section 14, sections 19 to 24, inclusive, and sections 27 to 30, inclusive, north half section 32, north half section 33 (surveyed); township 28 north, range 15 west, sections 24 and 25, all west of the Willamette meridian, in Washington, title to which may be vested in the United States or which may be acquired by the United States by donation or otherwise, and upon the addition of such lands to said park, the same shall be subject to all laws and regulations applicable to the park; *Provided further,* That the Secretary of the Interior is hereby authorized to accept title to any lands or interests therein within said area which may be donated for park purposes, the title and evidence of title to the same to be satisfactory to said Secretary."

Following section 1, insert a new section 2 as follows, and renumber the remaining sections accordingly:

"SEC. 2. That in the areas of said park lying east of the range line between ranges 9 and 10 and north of the Seventh Standard Parallel, and east of the range line between ranges 4 and 5 west, Willamette meridian, all mineral deposits of the classes and kinds now subject to location, entry, and patent under the mining laws of the United States shall be, exclusive of the land containing them, subject to disposal under such laws for a period of five years from the date of approval of this Act, with rights of occupation and use of so much of the surface of the land as may be required for all purposes reasonably incident to the mining or removal of the minerals and under such general regulations as may be prescribed by the Secretary of the Interior; *Provided further,* That any mining claim located under the provisions of this Act shall be null and void at the expiration of two years from the date of location unless within six months thereafter the owner of said claim shall submit to the Secretary of the Interior satisfactory proof that within the two-year period he has developed thereon a valuable deposit of minerals and has commenced actual mining operations, the decision of the Secretary, after due notice and after opportunity to be heard has been afforded to the parties in interest, to be final and conclusive."

On page 3, line 20 and line 23, strike out the words "Mount Olympus" and insert in lieu thereof the word "Olympic".

Strike out the proviso at the end of section 3.

If amended as suggested herein, I strongly recommend that H. R. 4724 be given favorable consideration by the Congress.

I have been advised by the Bureau of the Budget that there would be no objection by that Bureau to the presentation of this report to the Congress.

This Department has, however, been requested, under date of March 26, to submit a report to your committee on H. R. 10024, which also relates to the establishment of the Olympic National Park. That bill, with but a minor exception in regard to the exclusion of Ozette Lake, is the same as the proposal covered by this report. A report on H. R. 10024 is being submitted separately.

Sincerely yours,

HAROLD L. ICKES,
*Secretary of the Interior.*

DEPARTMENT OF THE INTERIOR,
*Washington, March 30, 1938.*

Hon. RENÉ L. DEROUEN,
*Chairman, Committee on the Public Lands,*
*House of Representatives.*

MY DEAR MR. CHAIRMAN: I have received your letter of March 26, enclosing a copy of H. R. 10024, entitled "A bill to establish the Olympic National Park, in the State of Washington, and for other purposes," and requesting a report thereon.

On March 11, 1937, your committee requested this Department to submit a report on H. R. 4724, which also relates to the establishment of the Olympic National Park. This Department's report on H. R. 4724 recommended several amendments to the bill. The proposal contained in our report on H. R. 4724 is the same as that embodied in H. R. 10024 with but a minor exception in that H. R. 10024 excludes Ozette Lake which is not indispensable to the proposed park area and, therefore, this Department recommends the enactment of H. R. 10024 in its present form.

The Bureau of the Budget has advised that the proposal embodied in our report on H. R. 4724, which is substantially the same as H. R. 10024 as stated above, would be in accord with the program of the President.

As your committee may desire to consider this Department's reports on H. R. 4724 and 10024 at the same time, the report contained in this letter has not been submitted to the Bureau of the Budget.

Sincerely yours,

HAROLD L. ICKES,
*Secretary of the Interior.*

## GOVERNMENT'S MEMORANDUM IN OPPOSITION

## II.  BACKGROUND

The Olympic Peninsula in northwestern Washington has long been recognized as an outstanding ecological environment, containing rainforests with centuries-old stands of virgin trees and the only native population of Roosevelt elk in the country. The history of the peninsula in the Twentieth Century has been one of a long struggle to provide permanent protection for the area in order to preserve the old growth forests and the elk that inhabit them from total destruction.

In the early 1900's, the Roosevelt elk on the Olympic Peninsula were being hunted excessively for their valuable canine teeth, or "ivories," and many of those populations had become decimated.  K. Jenkins, Status of Elk Populations and Lowland Habitat in Western Olympic National Park 1 (National Park Service 1981).  Public outcry about the depleted elk populations resulted in a ban on hunting in 1905 (*id.*).  In 1909, President Theodore Roosevelt took further steps to preserve the unique environment of the Olympic Peninsula when, acting pursuant to the Antiquities Act, 16 U.S.C. 431–433,[1] he created Mount Olympus National Monument.  Proclamation of March 2, 1909, 35 Stat. 2247.  The President's proclamation found the area worthy of national monument status for two reasons:  the region contained many objects of unusual scientific interest; and it had "from time immemorial ... formed the summer range and breeding grounds of the Roosevelt elk (*id.*).  President Roosevelt noted that those elk were "peculiar to [the Olympic] mountains" and that their number was "rapidly decreasing" (*id.*).[2]

The United States Forest Service assumed jurisdiction over Mount Olympus National Monument and administered it until 1933.  During that time, the monument was reduced to about one-half of its original acreage by three successive Presidential proclamations,[3] thereby allowing timber to be harvested on the lopped-off portions.  On June 10, 1933, President Franklin Roosevelt transferred jurisdiction over the Monument to the National Park Service.  Exec. Order No. 6166.

Starting in 1936, Congress made several attempts to enlarge Mount Olympus National Monument and to give it national park status.  Conservationists were concerned because the Monument did not contain the finest examples of the rainforests on the Olympic Peninsula nor did it include the winter range of the Roosevelt Elk.  H.R.Rep. No. 2658, *supra*, at 1.[4]  In 1936, extensive hearings were held in H.R. 7086, which would have created a national park two and one-half times the size of the original Monument.[5]  Major opposition to the bill came from the timber industry, which

---

1.  The Antiquities Act authorized the President to declare "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" situated on lands owned or controlled by the United States to be national monuments and to reserve those lands from settlement, entry, location or claim under the public land laws.  16 U.S.C. 431.

2.  The National Monument, which was 298,730 acres large or approximately one-third the size of the current-day park, centered around Mount Olympus.  35 Stat. 2247; H.R.Rep. No. 2658, 74th Cong; 2d Sess. 1 (1936).

3.  Proclamation of April 17, 1912, 37 Stat. 1737; Proclamation of May 11, 1915, 39 Stat. 1726; Proclamation of January 7, 1929, 45 Stat. 2984.

4.  The original monument contained only the summer range of the elk.  See Proclamation of March 2, 1909, 35 Stat. 2247.

5.  Hearings Before the House of Representatives Committee on Public Lands, 74th Cong., 2d Sess., on H.R. 7086 (April 23, 24, 25, 27, 28, 29, 30, May 1 and 5, 1936.

was concerned that inclusion of so much forest land within the proposed park would have a devastating impact on the local economy. See, *supra,* n. 5.

In 1938, Congress overcame this opposition and enacted H.R. 10024, which abolished Mount Olympus National Monument and created in its place Olympic National Park, approximately 648,000 acres in the size. Act of June 29, 1938, 52 Stat. 1241, codified at 16 U.S.C. 251–255. The Act authorized the President to add additional lands to the park by proclamation, but provided that the total area included within the park should not exceed 892,292 acres. 52 Stat. 1242. President Franklin Roosevelt added 187,400 acres to the park in 1940, Proclamation of January 2, 1940, 54 Stat. 2678, and President Harry Truman added 47,700 acres in 1953. Proclamation of January 6, 1953, 67 Stat. C27. These two proclamations added, respectively, the middle and lower portions of the Queets Corridor, a strip of land following the course of the Queets River from where it leaves the "core" portion of the park to where it enters the Quinault Indian Reservation, a point about four miles from the Pacific Ocean.[6]

The unique wonders of Olympic National Park continue to be recognized as deserving protection. In 1977, the United Nations Educational, Scientific, and Cultural Organization (UNESCO) certified ONP as a Biosphere Reserve. These Reserves consist of protected samples of the world's major ecosystem types which are devoted to conservation of nature and to scientific research. The Reserves provide a standard against which the effect of man's impact upon his environment may be measured. *National Park Service News Release* (May 18, 1977) (see Attachment A). More recently, in 1981, ONP was added to the World Heritage List. This List is maintained by the International Union for Conservation of Nature and Natural Resources, a group established under a 1972 international convention which recognizes and provides protection to natural and cultural properties that are considered to be irreplaceable treasures of outstanding value. *Department of the Interior News Release* (December 11, 1981)

**6.** The hunting incident at issue here occurred on land within the lower Queets Corridor. The United States condemned this land, which had been in private ownership, in June 1940, and the 1953 Proclamation included it within ONP.